# In the United States Court of Federal Claims

No. 14-1175C
(Filed: July 24, 2015)
FILED UNDER SEAL
REISSUED FOR PUBLICATION AUGUST 10, 2015[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **AMERICAN SAFETY COUNCIL, INC.** | |
| Plaintiff, | Cross Motions for Judgment on the Administrative Record; Motion to File |
| v. | Sur-reply; Motion to Supplement the Record; Bid Protest; Unduly Restrictive; |
| **THE UNITED STATES,** | Legitimate Need; Injunctive Relief CICA; OCI |
| Defendant, | |
| **and** | |
| **CLICKSAFETY.COM, INC.,** | |
| **Intervenor-Defendant** | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AN ORDER

**DAMICH, Senior Judge.**

In this pre-award protest, Plaintiff, American Safety Council, Inc. ("ASC") challenges the terms of a request for proposals from the U.S. Department of Labor ("DOL"), Occupational Safety and Health Administration ("OSHA"). The Solicitation sought proposals for its Online Outreach Training Program. The Protest challenges the Solicitation's terms as being unduly restrictive, inconsistent with customary commercial practice, ambiguous, and failing to address a conflict of interest.[2] As a result, ASC contends that the Court must enjoin OSHA from disrupting the *status quo* and causing irreparable harm to ASC and to others involved in OSHA's Online Training Program. Because the procurement is so fundamentally flawed,

---

[1] The original Opinion was filed under seal. The parties have conferred as to necessary redactions and those redactions have been made in this public opinion. Redacted sections appear with brackets as follows: "[. . .]".

[2] ASC has withdrawn its taking claim (the unilateral taking of ASC's Intellectual Property rights) for lack of ripeness. *See* ASC Reply at 28 n.28.

ASC argues the only proper remedy is the wholesale cancellation of the Solicitation. ASC is a potential awardee.

Currently pending before the Court are the parties' Cross Motions for Judgment on the Administrative Record, ASC's Motion to Supplement the Administrative Record, and Motion to File a Sur-reply Brief by ASC.

For the reasons set forth below, the Government's Cross Motion for Judgment on the Administrative Record is **granted in part** and **denied in part**, and ASC's Motion for Judgment on the Administrative Record is **granted in part and denied in part**. The Court further **denies** Defendant-Intervenor's Motion for Judgment on the Administrative Record. ASC's Motions to Supplement the Administrative Record and to File a Sur-reply are **denied**.

## I.     Procedural History

On December 5, 2014, ASC filed its Complaint in this Court. Along with its Complaint, ASC filed a Motion for a Temporary Restraining Order and Motion for Preliminary Injunction seeking to preserve the status quo by enjoining OSHA from proceeding with the Solicitation.[3]

After a hearing, the Court denied ASC's Motion for a Temporary Restraining Order and Preliminary Injunction determining that the balance of the four factor test for injunctive relief as well as the representation by Government counsel that it would not make any award until the Court rules on the protest weighed in favor of the Government. The Court allowed the Government to receive bids and begin evaluations and the Government agreed that it would not make any award until the conclusion of this litigation. *See* Order Dated December 11, 2014, ECF #16.

ClickSafety.com, Inc., filed an unopposed Motion to Intervene, as a Defendant-Intervenor, which was subsequently granted. *See* Order dated January 14, 2015, ECF #36. PureWorks, Inc., d/b/a UL Workplace Health and Safety ("UL WHS") also filed a Motion to Intervene, which was denied. *See* Opinion and Order dated February 18, 2015, ECF #49.

The Administrative Record ("AR") was filed by the Government on January 6, 2015. On February 2, 2015, ASC filed a Motion to Compel Completion of the Administrative Record and after several Motions by ASC and subsequent Court orders[4] the Court permitted the record to be supplemented. ASC was permitted to supplement the record with the affidavit of Jeffery R. Pairan, Chief Executive Officer of ASC ("Pairan Affidavit") which ASC had already filed as an

---

[3] ASC also filed, pursuant to Rule 40.2 of the Rules of the Court of Federal Claims ("RCFC'), a Notice of Related Case, *American Safety Council v. United States*, l2-355C (Fed. Cl. 2012). In that action, the Court ordered: "if Plaintiff files a bid protest involving the new solicitation the Clerk is directed to assign the protest to the undersigned." The case was subsequently assigned to the undersigned.

[4] *See* Order dated February 24, 2015, ECF #52; Order dated February 27, 2015, ECF #56; Order dated March 13, 2015, ECF No. 66.

attachment to its Motion for Judgment on the Administrative Record.  The Court permitted the Government to supplement the record with the Administrative Officer's affidavit explaining the genesis of the documents that were not self-authenticating ("Payne Dec.").  The Court further permitted the Government to supplement the record with the names, number of offerors and each offeror's proposal.  These documents were filed by the Government in an Amended Administrative Record ("Am. AR") on March 9, 2015.  Defendant-intervenor was permitted to supplement the record with an affidavit to address conflict of interest allegations raised by ASC, filed with its Cross Motion and Response to Plaintiff's Motion for Judgment on the Administrative Record on March 6, 2015.

ASC filed its Motion for Judgment on the Administrative Record ("Pl.'s Mot. JAR"), on February 6, 2015, to which ClickSafety.com ("Def.-Int. Cross Mot. JAR")[5] and the Government ("Def. Cross Mot. JAR") timely responded.  All parties timely filed their respective replies.

## II.  ASC's Motion to File a Sur-reply and Motion to Supplement the Administrative Record

### A.  Motion to File a Sur-reply

On May 13, 2015, ASC filed a Motion for Leave to File a Sur-reply to the Government's Reply in Support of Cross-Motion for Judgment on the Administrative Record.  The Government responded in opposition ("Def. Resp.") to which ASC did not reply.  In it Motion, ASC contends that the Government raises three factual or legal issues for the first time, therefore, a sur-reply should be allowed.

It has been held that sur-replies are generally disfavored.  *See Wright ex rel. Trust Co. v. Abbott Labs.*, 62 F. Supp. 2d 1186, 1187 n.1 (D. Kans. 1999) ("Surreplies are disfavored, and normally will be permitted only upon prior invitation by the court."), *aff'd*, 259 F.3d 1226 (10th Cir. 2001).  As a strategic move, a non-movant will attempt to file a sur-reply as an effort to get the last word.  *Lacher v. West*, 147 F. Supp. 2d 538, 539 (N.D. Tex. 2001) ("Surreplies, and any other filing that serves the purpose or has the effect of a surreply, are highly disfavored, as they usually are a strategic effort by the nonmovant to have the last word on a matter.").  That is the case here.  The three issues that ASC contends are being raised for the first time, have either been raised by the Government in its initial brief or responded to an issue raised in ASC's reply brief.  Thus, ASC has not identified any basis for its sur-reply, other than, as the Government points out, "to get the last word."  Def. Resp. at 2. Therefore, ASC's Motion to File a Sur-reply is denied.

### B.  Motion to Supplement the Administrative Record

On May 20, 2015, and in connection with its Response and Reply to Defendant's Opposition and Cross-Motion for Judgment on the Administrative Record, ASC filed a Motion to Supplement the Administrative Record ("Pl.'s Mot. Supp.") with the supplemental affidavit of

[5] ClickSafety.com's brief only addresses the Conflict of Interest arguments by ASC that the Court discusses in Section VI D.

Jeffery R. Pairan ("Supp. Pairan Affidavit").  ASC argues that the "affidavit provides crucial context and clarification regarding the private, proprietary courseware and supporting programs to which the Solicitation's onerous intellectual property ("IP") provisions would apply." Pl.'s Mot. Supp. at 1.  The Government disagrees advancing that the affidavit is not needed for meaningful review.

In general, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 (1973).  A court may supplement the administrative record, however, if it finds that supplementation is necessary to ensure that "effective judicial review" is not frustrated. *Axiom Resource Mgmt., Inc. v. United States,* 564 F.3d 1374, 1381 (Fed. Cir. 2009).  Such supplementation should occur "if the existing record is insufficient to permit meaningful review consistent with the [Administrative Procedure Act]." *Id.*  "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review." *Id.* at 1380 (quotations omitted).

The Court agrees with the Government that the supplemental affidavit should not be admitted into the administrative record because it is are not necessary for meaningful review. The Court discusses the arguments made by ASC later in its opinion as ASC has already raised these issues in its opening and responsive briefs. *See* discussion *infra* Section VI part A1. Therefore, the Court denies ASC's Motion to Supplement the Record.

The case is now ripe for disposition.

## III.   Background

By statute, OSHA must "provide for the establishment and supervision of programs for the education and training of employers and employees in recognition, avoidance, and prevention of unsafe or unhealthful working conditions. . . ."  29 U.S.C.  § 670(c)(1).  OSHA can provide this training "directly or by grants or contracts."  29 U.S.C.  § 670(a)(1).  Aside from the mandate to "establish [ ] and supervis[e]," the statute does not provide any guidance as to how to implement training programs for workers.

As a result, in 1971, OSHA established the Outreach Training Program. ARTab 34 at 334. This program authorizes trainers, through its OSHA Training Institute Education Centers, to teach classes regarding basic occupational safety and health workplace hazards. *Id*. The outreach courses are given by independent OSHA-authorized trainers, not by OSHA.  Even though OSHA does not directly provide outreach courses to workers, the content of any course provided must include OSHA's training requirements and OSHA must approve the course materials.  AR Tab 16 at 103; AR Tab 34 at 334.  Thus, OSHA has defined specific requirements that must be taught in any course, including worker rights, employer responsibilities, filing complaints, and recognizing, avoiding and preventing workplace hazards. S*ee id*., AR Tab 16 at 103.  An individual who completes an authorized course receives an OSHA course-completion card.  AR Tab 16 at 103.  The completion card serves as proof of completion of OSHA's officially authorized courses, a requirement that is necessary in some jurisdictions. *Id*.; AR Tab 34 at 334.

At the onset and until 2001, the authorized providers and trainers were required to conduct in-person training. AR Tab 1 at 1. Then, in 2001, OSHA started the Online Training Program, which provided for online, rather than classroom delivery of certain courses. *Id*. Specifically, OSHA authorized online training courses for its 10-hour and 30-hour construction and general industry programs. AR Tab 1 at 2; AR Tab 34 at 336.

In order to become an authorized online training provider, OSHA implemented an application process. *Id*. Through this process, OSHA authorized nine online training providers. *Id*. Over the past five years, the number of students taking OSHA-authorized in-person and online courses have reached an average of 750,000 students annually, with over 180,000 students in fiscal year 2014 receiving online training. AR Tab 1 at 1.

On October 31, 2009, a moratorium was instituted by OSHA on receiving or approving any additional applications for online training providers because of "concerns regarding quality control issues, program redundancy, and the ability to review and respond to the applications in a timely manner with current resources," *id*, and reselling agreements, *id*.  In response to these problems, OSHA's Director of Training and Education, Dr. Henry Payne, recommended that OSHA replace the incumbents by using a new competitive process. AR Tab 1 at 2. According to OSHA, the new plan was expected to develop "robust technical specifications and control measures" for the competitive process. *Id*. The formalized plan resulted in a Request for Applications ("RFA") and on March 29, 2011, OSHA issued an RFA by notice in the Federal Register for online OSHA Outreach Training Courts providers to enter into cooperative agreements. AR Tab 2 at 5; *see also* 76 Fed. Reg. 17451 (Mar. 29, 2011).  Subsequently, OSHA awarded cooperative agreements under the RFA on January 12, 2012. The awards were protested by ASC and 360Training.com and heard by this Court. *See Am. Safety Council, Inc. v. United States*, Nos. 12-210C (Fed. Cl. 2012), 12-355C (Fed. Cl. 2012), and *360Training.com, Inc. v. United States,* No. 12-197C (Fed. Cl. 2012).

In its first opinion, this Court found that the RFA was a "procurement" under 28 U.S.C. § 1491(b)(1), and, therefore, had jurisdiction to hear the protests. *360Training.com, Inc. v. United States*, 104 Fed. Cl.  575, 588 (2012). In its second opinion on the merits, this Court held that OSHA improperly failed to document its evaluation and improperly disqualified 360Training.com from the competition. *360Training.com, Inc. v. United States,* 106 Fed. Cl. 177, 192 (2012). As a result, OSHA took corrective action and canceled the RFA and the awards. AR Tab 3 at 15.

Following this Court's ruling, on January 30, 2013, Dr. Payne, drafted a memorandum entitled "OSHA Outreach Training Program Outsourcing the Delivery of Online Training" which provided an outline of the issues and recommended solution in developing the revised solicitation. AR Tab 3 at 14-16; Declaration of Henry A. Payne ¶ 2 ("Payne Dec."). In his memorandum, Dr. Payne identified problem areas in the online outreach training program including: the difficulty to process the applications of providers in a timely manner, the difficulty to effectively manage the approved training providers, the difficulty in monitoring the training content on an on-going basis, and the proliferation of resellers and misleading advertising, causing confusion to the general public. AR Tab 3 at 14.

The memorandum also enumerated OSHA's vendor expectations including: the development of course content, the implementation of course revisions, hosting courses, conducting registration and accepting payment, providing trainers for student support, the issuance of OSHA course completion certificates and cards, training evaluations, to charge tuition and to pay OSHA a licensing fee for each student registered.  AR Tab 3 at 15.   It also included what Dr. Payne termed as "key benefits."  Such benefits included that OSHA:  would be able to reduce the number of online providers eliminating the need for additional Agency resources for management and oversight, would own the product and have absolute control over it, and would establish the maximum tuition rates.  AR Tab 3 at 15-16.  In addition by offering online Outreach Training Programs only through the Agency, this Dr. Payne opined would eliminate confusion, misleading advertising, and fraudulent activity among private sector training organizations.  *Id.*

Dr. Payne presented some of these same benefits to various individuals.  For instance, he presented the benefits directly to the Assistant Secretary of Labor for Occupational Safety and Health, Dr. David Michaels and Deputy Assistant Secretary, Mr. Jordan Barab.  In his presentation, Dr. Payne reiterated the need to curb confusion among the public, to allow OSHA to have a perpetual, non-exclusive, royalty–free license to use, copy, and distribute all training materials developed under the contract in order to have absolute control over the training content, to manage the number of vendors by limiting the number of awards based on OSHA's limited resources and the need to monitor the providers with the ultimate goal that the technology providers would support the online training offered as an "OSHA branded" program.  AR Tab 5, Payne Dec. ¶ 3.  He further provided a variation of his outline and solution memorandum to the House Committee on Education and the Workforce.  AR Tab 5, 10; Payne Dec. ¶¶ 3-4.

After these presentations, on August 29, 2014, Dr. Payne transmitted the final draft of the Solicitation to Deputy Assistant Secretary Dougherty.  AR Tab 11 at 34.

## IV.   The Solicitation

On October 1, 2014, OSHA issued the present Solicitation via a Notice in the Federal Register, through press releases, letters to the incumbent vendors, and letters to all applicants to the previous RFA.  AR Tab 14-16, 18, 19.  The Solicitation informed potential offerors that:

> Although contracts resulting from this Solicitation will not be funded with appropriated funds, and the Federal Acquisition Regulation (FAR) will not apply, the solicitation document utilizes a FAR–type format for convenience, and incorporates provisions and clauses adapted from those found in the FAR.

AR Tab 16 at 97.

To be considered, all potential and current OSHA-authorized online providers were required to submit a proposal under this Solicitation, AR Tab 16 at 100, 101.  Further, OSHA indicated that it would award one or more contracts (up to two per construction, general

industry, maritime, and youth programs) for a base year with four, one-year options.  AR Tab 16 at 97, 101.

The Solicitation stated that in consideration of performance, only vendors that were awarded a contract would be OSHA-authorized online providers, and, as such, would be the only online providers that can issue OSHA course completion cards.  *Id.*  In addition, the Solicitation stated that the awards would be "authorization-type" contracts and not involve any payment by the Government, AR Tab 16 at 101, and prohibited offerors from charging more than $99 for any 10-hour course or $199 for any 30-hour course, AR Tab 16 at 101, 104.   It further prohibited reselling. *Id.*  The awardees would be responsible for developing and teaching the courses based on OSHA's requirements and industry procedures already on OSHA's website, AR Tab 16 at 103, and contained a data rights clause that would permit OSHA to obtain a license for training materials developed under the contract, AR Tab 16 at 122.

In particular, the data rights clauses stated the following:

### H.1 RIGHTS TO DATA

The Contractor agrees to the extent that it receives or is given access to data necessary for the performance of this contract which contains restrictive markings, the Contractor shall treat the data in accordance with such markings unless otherwise specifically authorized in writing by the Administrative Officer.

DOL will not own, but will have a perpetual, non-exclusive, royalty-free license to use, copy, distribute, and prepare derivative works from, all training materials developed for use under this contract.

AR Tab 16 at 122.

### I.2 CLAUSES INCORPORATED BY REFERENCE

**The texts of the following clauses are incorporated by reference:**

### <u>CLAUSE</u> <u>TITLE AND DATE</u>

52.227-14 Rights in Data – General. (DEC 2007)
52.227-15 Representation of Limited Rights Data and Restricted Computer Software. (DEC 2007)
52.227-17 Rights in Data—Special Works. (DEC 2007)
52.227-18 Rights in Data – Existing Works. (DEC 2007)

AR Tab 16 at 125.

Potential offerors were also required to provide technical and business proposals, including providing cost information and identifying past performance references. AR Tab 16 at 131-32.  The Solicitation stated that OSHA's determination of best value would be made by using the Technical and Past Performance factors, with Technical being slightly more important than Past Performance. AR Tab 16 at 129-43. In the event of a tie, OSHA would conduct a realism analysis.  *Id.*

Questions were then submitted by potential offerors, AR Tabs 22, 27, 31, 33, and OSHA responded, AR Tabs 26, 30, 32, 35, 36.  The last OSHA response was dated December 4, 2014. AR Tab 36.

On December 12, 2014, OSHA received [. . .] proposals. Am. AR Tabs 37-56.  Of the [. . .] proposals received, [. . .] offerors [. . .] submitted proposals for construction, general industry, or both programs. Am. AR Tab 37 at 352.

## V.     Standard of Review

This Court's bid protest jurisdiction is provided by the Tucker Act. 28 U.S.C. § 1491(b) (2012). The Tucker Act provides that, in a bid protest action, the Court reviews an agency's procurement actions under the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706 (2012).  28 U.S.C. § 1491(b)(4); *see Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Under the APA, the Court determines, based on a review of the record, whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "[A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or, (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni*, 238 F.3d at 1332.

Where the parties have filed cross-motions for judgment on the administrative record, as here, RCFC 52.1 provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  Unlike summary judgment standards, genuine issues of material fact do not preclude a judgment on the administrative record. *See id.* at 1355-56.  Questions of fact are resolved by reference to the administrative record. *Id.* at 1356.

For injunctive relief, the Court must determine: the plaintiff's success on the merits, irreparable harm if the court withholds such relief, the balance of hardships to the respective parties, and the public interest in granting injunctive relief.  *Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009).

## VI.     Discussion

ASC protests the Solicitation's terms on four grounds.  First, ASC argues that the terms of the Solicitation are unduly restrictive.  Second, ASC contends that the Solicitation is

inconsistent with customary practice; and third that it is ambiguous.[6]  Fourth, and finally, ASC argues that the Solicitation fails to address a conflict of interest.  ASC asserts that each of the challenged terms violate federal procurement law for the reason that OSHA lacked any legitimate need for the Solicitation's terms.  The question for the Court, therefore, is to determine whether OSHA had a rational basis for each of the contested terms.  If the Court finds that the procurement official's decision lacked a rational basis, OSHA's actions are deemed to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491.

## A. Competition in Contracting Act ("CICA") and the Solicitation's Terms

ASC argues that the Solicitation contains numerous restrictive terms that serve as barriers to competition in violation of CICA and that the restrictions serve no legitimate need.  Specifically, ASC argues that there is no justification or agency need for the Solicitation's Intellectual Property ("IP") clauses, for limiting the number of awardees, for prohibiting resellers, for the cost analysis evaluation scheme, or for price cap restrictions.

CICA demands that agencies "create specifications that solicit proposals 'in a manner designed to achieve full and open competition.'"  *CW Gov't Travel, Inc. v. United States,* 99 Cl. Ct. 666 (2011*)* citing 41 U.S.C. § 3306(a)(1)(A)–(C) (2011)).  In furtherance of this policy of full and open competition, agencies are allowed to include restrictive requirements in a solicitation only to the extent they are necessary to satisfy the agency's legitimate needs.  *See* 41 U.S.C. § 3306(a)(2)(B). The question becomes whether the restrictions are required to meet the Government's minimum needs.  *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[C]ompetitors do not dictate an agency's minimum needs, the agency does.)  And determining an agency's minimum needs is a matter within the broad discretion of agency officials . . .   and is not for [the] court to second guess." (internal citations and quotations omitted.)).  If the solicitation requirements violate this prohibition the terms are deemed unduly restrictive.  In turn, if a Court finds a solicitation's terms are unduly restrictive and serve no legitimate agency need, the Court will find the agency's decision to include those terms in the solicitation to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997).

Nowhere in the Government's briefs does the Government contend that CICA does not apply to this Solicitation; instead, it argues that an agency has broad discretion to determine its minimum needs and competitors may not dictate those needs.  Thus, the Government argues that none of the challenged terms restrict the competition; instead each of the terms meets OSHA's minimum needs and, therefore, the Court should defer to OSHA's judgment regarding its need.

As a threshold issue, the Government argues that because the agency received [. . .] proposals the Court need not address the specific issues raised by ASC because this fact alone

---

[6] ASC has withdrawn almost all of its contentions that the Solicitation is ambiguous.  *See* ASC Reply at 28 n.28.  The Court, therefore will only address the remaining ambiguous claim, the Agency's cost and pricing evaluation scheme.  *Id.*

proves that the terms of the Solicitation are not unduly restrictive.  *See i.e. CompTech-CDO, LLC*, B-409949.2, 2015 CPD ¶ 62 at 5 (Comp. Gen. 2015) ("In fact, the record here shows that five firms responded which hold a Top Secret facility clearance, undercutting CompTech's argument that the requirement is unduly restrictive.).  Although this fact does indeed undercut the argument that the terms are unduly restrictive, it does not *prove* that the terms are not unduly restrictive.  It may very well be that even more proposals would have been submitted if the restrictions in the solicitation were included only to the extent that they were necessary to satisfy the agency's legitimate needs.  Indeed, the very inclusion in the Act of the qualification on the extent of the restrictions in a solicitation indicates that the goal of CICA is not just *any* level of competition but the best level possible under the circumstances.

Regarding the issues specifically raised by ASC, the Court determines that only the intellectual property rights terms are unduly restrictive and serve no legitimate agency need as reflected in the Solicitation.  As such, the Court finds OSHA's decision to include those terms in the Solicitation to be in violation of CICA and thus arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The Court finds that the remaining contested terms are not unduly restrictive and, therefore, the remaining terms do not violate CICA.

### 1.   The Technical Data Rights Clauses are Unduly Restrictive

OSHA has included technical data rights clauses in the Solicitation.  *See generally* Solicitation Clause H, I.  These clauses, ASC argues, are unduly restrictive and do not serve OSHA's minimum needs.   In particular, ASC contends that OSHA is not an online provider, therefore, it has no legitimate need for proprietary IP in the form of course content.  Pl.'s Mot. JAR at 13.  In addition, ASC argues that the administrative record does not provide a rational basis for those terms.

In contrast, the Government asserts that ASC's mere disagreement with these clauses is not sufficient to demonstrate that they do not reflect the agency's needs.  Def. Cross Mot. JAR at 15. *See also Gallup, Inc.*, B-410126, 2014 CPD ¶ 280 at 5 (Comp. Gen. 2014) ("The fact that a requirement may be burdensome or even impossible for a particular firm to meet does not make it objectionable if the requirement properly reflects the agency's needs.").

The Court agrees with ASC that the clauses are unduly restrictive because the requirements do not properly reflect the agency's needs.

### a.   Clause H.1 of the Solicitation

The Solicitation included the following data rights clause:

## H.1 RIGHTS TO DATA

The Contractor agrees to the extent that it receives or is given access to data necessary for the performance of this contract which contains restrictive markings, the Contractor shall treat the data in accordance with

such markings unless otherwise specifically authorized in writing by the
Administrative Officer.

DOL will not own, but will have a perpetual, non-exclusive, royalty-free
license to use, copy, distribute, and prepare derivative works from, all
training materials developed for use under this contract.

AR Tab 16 at 122.

This clause was then interpreted by OSHA during the question and answer period.  AR
Tab 36.  "Training materials" were defined as "course content," not the software.   AR Tab 36 at
346.  OSHA further defined "all training materials developed for use under this contract" to
mean "any and all works that form any part of the content, curriculum, or other supporting
documents first developed under or in support of this Contract, and any such works or portions
thereof that are utilized in the performance of this Contract."  *Id*.; AR Tab 26 at 283. Thus, it is
the Government's contention that the clause and explanation amended the Solicitation limiting
OSHA to that of only acquiring a license to data that could be copyrighted, not an unlimited
rights license as ASC contends.  Def. Cross Mot. JAR at 15-16.

That the clause concerning restrictive markings is connected to a legitimate agency need
is clear on its face.  The purpose of the licensing clause, however, is not connected to the goal of
the Solicitation.  Indeed, the over-breadth of this clause was recognized by the agency and
limited during the question and answer process to exclude software.  The clause, as limited,
would be connected on its face to a legitimate agency need given the goal of the Solicitation—
arguably—if, for example, the license were limited to internal use only.  But except for this
example of a need that is inherent, the Court is at a loss to find in the administrative record any
indication of how the acquisition of a broad license in the course content is connected with the
authorization of entities to offer approved online courses.  Indeed, the licensing clause gives the
impression that the agency seeks to *acquire* intellectual property rights. If so, the acquisition of
copyright rights might very well change the nature of the Solicitation.

The Court notes that during the question and answer process, the recommendation of
FAR 27.406-1(c) that the Government avoid unlimited[7] data transfer requirements was brought
up in the context of discussion on the breadth of the IP clauses.  In response, OSHA first pointed
out that the FAR did not apply to this Solicitation—presumably because the goal was
authorization rather than acquisition—but then OSHA stated that the Rights to Data clause "was
included to allow the agency to use contractor content in the development of other training
materials to support its mission." AR Tab 36 at 346.  This statement indicates to the Court a clear
intent to acquire intellectual property rights for a use *independent of the purpose of the*

---

[7] In its brief the government makes much of the fact that OSHA is not asking for
unlimited rights because the right to perform publicly and the right to display publicly were not
included.  Def. Cross JAR at 15.  However, the thrust of 27.406-1(c) is that the government
ought to tailor the data rights it needs to its purposes.  Otherwise, an insignificant limitation
(such as the ones pointed out in the brief) would be enough to comply with the provision.  A
similar ploy is using a license rather than ownership when the practical effect is the same.

*Solicitation*.  Indeed, the agency disclaims any desire to use the IP rights in the online context, which is the object of the Solicitation.  OSHA expressly states that the FAR does not apply to this Solicitation because it is a solicitation "for professional services" (despite the fact that it uses FAR provisions throughout).  OSHA cannot have it both ways.  It is either a solicitation limited to professional services—in which case the FAR need not apply—or it is also the acquisition of intellectual property rights—in which case the FAR applies.

The perfectly legitimate goals of approving and monitoring the providers' courses are already addressed by less restrictive methods in the Solicitation.  For instance, the Solicitation requires providers, before they even offer a course to the general public, to submit courses for approval through an OSHA review process.  *See* AR Tab 16 at 115.  The Solicitation provides that OSHA has the authority to review and monitor providers' courses through the Quality Assurance Surveillance Plan that will be implemented during the contract performance allowing OSHA to regularly review the course offerings.  AR Tab 16 at 106.  The Solicitation allows for the Inspection of Services, which gives OSHA broad authority to inspect and test all services, including the providers' course.  AR Tab 16 at 125.  These provisions provide OSHA with the oversight it has stated that it needs.  If OSHA wants to include a tailored IP clause, OSHA must limit that clause to its specific needs.  As written, paragraph two of IP clause H is over-burdensome compared to its purpose to provide and authorize online courses.  Furthermore, it bears the hallmarks of an acquisition to which the FAR would apply. Thus, the Court finds paragraph two of IP clause H unduly restrictive.

### b.  Clause I of the Solicitation

Clause I of the Solicitation incorporates by reference four FAR technical data clauses.[8] These FAR provisions are incorporated wholesale without any attempt to tailor their provisions to the purpose of the Solicitation.  This is done despite the fact that the provisions were written for acquisitions and despite the fact that they contain *alternate* provisions, as is the case with 52.227-14!  Furthermore, the Government itself, in its brief, acknowledges that 52.227-15(b) is irrelevant to the Solicitation.  Def. Cross JAR at 17.

The Government valiantly tries to rescue this part of the Solicitation by focusing on 52.227-14(c)(2), the thrust of which is that a contractor should not incorporate data produced by another without securing the government's rights in this data.  This can, of course, be connected to unfettered internal use of providers' materials, which the Court has opined as a legitimate restriction.  But, more important, the very exercise by government counsel in examining various provisions of the multiple-section FAR provision to find one that is connected to the purpose of the Solicitation proves that this provision can—and should—be so tailored.

---

[8] The regulations are as follows: (1) 48 C.F.R. § 52.227-14 – Rights in Data – General; (2) 48 C.F.R. § 52.227-15 – Representation of Limited Rights Data and Restricted Computer Software; (3) 48 C.F.R. § 52.227-17 – Rights in Data – Special Works; and (4) 48 C.F.R. § 52.227-18 – Rights in Data – Existing Works.  AR Tab 16 at 125 (incorporating these clauses by reference).

Thus, the Court determines that the wholesale incorporation of large swaths of the FAR that concern the acquisition of data rights without any discernable attempt to tailor them to the purpose of the Solicitation is unduly restrictive and is arbitrary, capricious, an abuse of discretion, or otherwise in violation of law.

### 2.  The Clauses That Are Not Unduly Restrictive

#### a.  The Required Cost Information is Not Unduly Restrictive

ASC argues that the Solicitation's cost information basis serves no legitimate agency need and is unduly restrictive; therefore its inclusion lacks a rational basis. The Court disagrees.

The Solicitation states:

> M.4 BUSINESS EVALUATION
>
> Cost is not a weighted factor and will not be scored; it will only be a factor in the selection if two or more proposals are otherwise equivalent in Technical Merit and Past Performance. . . . The cost of the proposal will be evaluated on the basis of cost realism which is defined as the Offer[or]'s ability to project costs which are reasonable and indicate the Offeror understands the nature and extent of the work to be performed.

AR Tab 16 at 141.

Inserting a price realism analysis to measure an offeror's understanding to a Solicitation is not new.  *Ceres Envtl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 303 (2011) ("[A]n agency may, at its discretion, provide for the use of a price realism analysis to measure an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance from a contractor who is forced to provide goods or services at little or no profit.).  Here, the Solicitation is clear: it will only use cost information as a tie breaker between two technically equivalent offers.  Thus, it is not irrational that, if necessary, OSHA may appropriately test an offeror's understanding of the Solicitation's requirements using a realism analysis.[9]  The Court, therefore, defers to OSHA in its determination of its needs and finds that the use of a realism analysis is not unduly restrictive.

#### b.  Limiting the Number of Awardees is Not Unduly Restrictive

---

[9] The real thrust of ASC's argument is that the cost request is a "burdensome requirement" and, therefore, the cost information should not be included in the Solicitation.  Pl.'s Resp. and Reply to Def. Cross Mot. JAR at 10.  However, just because the requirement may be burdensome, such a requirement does not make it unduly restrictive.

ASC contends that OSHA's decision to limit the number of contract awards serves no legitimate agency need and is unduly restrictive; therefore its inclusion lacks a rational basis. The Court disagrees.

As it has been held, it is within the sound discretion of an agency to determine its minimum needs and determine the number of contract awards, consistent with a solicitation's requirements. *See Savantage*, 595 F.3d at 1286 ("[C]ompetitors do not dictate an agency's minimum needs, the agency does."); *cf. also Sys. Res. & Applications Corp.*, B-298107 et al., 2006 CPD ¶ 103 at 10 (Comp. Gen. 2006) ("[W]here multiple awards are contemplated by a solicitation, the agency is entitled to exercise sound business judgment consistent with the terms of the solicitation in determining how many awards should be made."); *Cybermedia Techs., Inc.*, B-405511.3, 2011 CPD ¶ 180 at 3 (Comp. Gen. 2011) (dismissing protest for failure to state a valid protest basis where protester asserted agency should make nine rather than eight awards).

Here, the record supports OSHA's decision to limit the awards due to limited resources to oversee the program.  AR Tab 3 at 15 ("The reduced number of online providers (4) will eliminate the need for additional Agency resources for management and oversight."); AR Tab 5 at 19 ("Addresses key concern of managing a large number of vendors by limiting the number of awards based on OSHA's limited resources and the need to monitor providers."); AR Tab 1 at 1, 2; AR Tab 34 at 334  (In 2009, OSHA implemented the current moratorium on approving new providers based on a lack of "current resources" and noting that it did not have the "dedicated resources" to continuously review and approve new programs.); AR Tab 3 at 14 (Dr. Payne's outline for the Solicitation explained that OSHA found it difficult to "effectively manage the growing number of approved training providers" and "monitor the training content on an ongoing basis.").  Thus, OSHA provided a rational basis for limiting the number of awards.

Even if there was a rational basis for limiting the number of awards, ASC argues that by limiting the number of awards, OSHA will not be able to meet the increasing demand for online training in order to meet that need.  Therefore, OSHA must award more contracts than the Solicitation provides.  Pl's Mot. JAR at 20.  However, the Solicitation takes this into consideration by requiring each offeror to demonstrate its technical capability.  AR Tab 16 at 138 ("Provide a list of system capabilities, including the number of servers and available bandwidth.").  Consequently, OSHA does not need many contractors, it only needs between one and eight awardees with sufficient bandwidth and servers to meet student demand.   ASC fails to show that OSHA's choice to limit the awards is unreasonable or contrary to law.  The Court, therefore, defers to OSHA in its determination of its needs and finds that the limiting of awards is not unduly restrictive.

### c.  Prohibiting Reselling is Not Unduly Restrictive

The Solicitation prohibits the use of resellers.  AR Tab 16 at 104.  This, ASC argues, serves no legitimate agency need and is unduly restrictive; therefore its inclusion lacks a rational basis.  ASC further argues that the decision to restrict the use of reseller lacks supporting evidence.  Pl.'s Mot. JAR at 21.  According to the Government this prohibition is necessary to avoid consumer confusion, misleading advertising, and fraud.  Def. Cross Mot. JAR at 23.

The record contains the memo written by Dr. Payne in contemplation of the current solicitation.  *See* AR Tab 3 at 14; *see also* Payne Dec. In his memo Dr. Payne specifically noted that "problem areas included the proliferation of resellers and misleading advertising, causing confusion for the general public." In order to remedy these concerns, OSHA sought to offer online classes "only through the Agency" to "eliminate confusion about the training provider for the general public" and "eliminate misleading advertising and fraudulent activity among private sector training organizations."  AR Tab 3 at 16; *see also* AR Tab 34 at 335 ("The resale to third parties is prohibited to ensure transparency to the consumer. This has been a major issue for OSHA during recent years.").  In addition, Dr. Payne presented these concerns to the Assistant Secretary of Labor for Occupational Safety and Health, Dr. David Michaels, and Deputy Assistant Secretary, Mr. Jordan Barab, as well as with the House Committee on Education and the Workforce.  AR Tabs 5, 10; Payne Dec. ¶¶ 3-4.

These statements, argues ASC, are not enough—there is a lack of pre-decisional documents in the record to show that consumers are confused and there are no contemporaneous communications to prove this conclusion.  Pl.'s Mot. JAR at 21.  However, the Federal Circuit does not require such documentation.  Instead, the Federal Circuit has stated that a court may accept an agency's concerns without supporting evidence for the concerns. *Weeks Marine v. United States*, 575 F.3d 1352, 1370 (Fed. Cir. 2009) (repeating the conclusion from *CHE Consulting* that an agency's "concerns provided a rational basis for [agency's] procurement, even though the documents provided no supporting evidence for the concerns expressed"); *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1355 (Fed. Cir. 2008) (stating an agency "has no obligation to point to past experiences substantiating its concerns in order to survive rational basis review" and "CICA imposes no obligation to supply a historical record of failures in order to substantiate a risk").  Following Circuit precedent, the Court finds that OSHA has expressed a significant concern regarding consumer confusion, misleading advertising, and fraud and its decision to prohibit reselling survives rational basis review.[10]

### d.   The Price Ceilings are Not Unduly Restrictive

The use of price caps, argues ASC, does not serve a legitimate agency need and is unduly restrictive; therefore its inclusion lacks a rational basis.  Pl.'s Mot. JAR at 25.   The Court disagrees.

An agency may appropriately impose price ceilings or mechanisms on a contractor that maximize the risk to the contractor and minimize the risk to the Federal Government or its beneficiaries. *Sims v. United States*, 112 Fed. Cl. 808, 817 (2013) (stating that "[i]t is within the discretion of an agency to offer for competition a solicitation that imposes maximum risks upon the vendor and minimum burdens on the agency") (citations and internal quotations omitted); *cf. also* 48 C.F.R. § 32.704 (recognizing that an agency may impose a ceiling on rates using a limitation of cost or limitation of funds clause).

---

[10]  The Solicitation also incorporates a clause that prohibits kickbacks, 48 C.F.R. § 52.203-7 – Anti-Kickback Procedures – which could prohibit a reseller relationship. *See* AR Tab 16 at 125 (incorporating clause).

In planning the Solicitation, OSHA stated: "OSHA can establish maximum tuition rates and ensure that the training is provided at a reasonable cost to the general public." AR Tab 3 at 15; *see also* AR Tab 5 at 19; AR Tab 10 at 31; Am. AR Tab 34 at 335.  The end result was that the Solicitation limited the tuition price awardees may charge students taking OSHA authorized online courses – $99.00 for 10-hour courses and $199.00 for 30-hour courses.[11]  AR Tab 16 at 101.

ASC argues, there is already adequate price competition in the marketplace and will continue as long as online course providers are available in any number.  *Id.*  However, the Court has already found limiting the number of awardees acceptable.  In doing so, the Court has effectively allowed OSHA to confer, by contract, monopoly or duopoly status on OSHA authorized providers to teach online courses that result in an OSHA course-completion card.  Consequently, OSHA is not regulating a free market, but creating a regulated market.  This justifies why OSHA would want to regulate the maximum price to be charged.  OSHA properly demonstrated its basis for placing a price ceiling on the rates awardees can charge the public for providing OSHA-authorized courses.  The Court will, therefore, defer to OSHA in determining its own needs, and finds that the limit is not unduly restrictive.

### B.  The Solicitation Terms Are Not Inconsistent with Customary Commercial Practice

As noted previously, when an agency develops a solicitation, the agency must "develop specifications in the manner necessary to obtain full and open competition with due regard to the nature of the property or services to be acquired."  41 U.S.C. § 3306(a)(1)(C).  In order to facilitate full and open competition, the Federal Acquisition Streamlining Act of 1994 ("FASA") was enacted to "revise and streamline the acquisition laws of the federal government" and "facilitate the acquisition of commercial products."  *CGI Federal Inc. v. United States*, 779 F.3d 1346, 1352 (Fed. Cir. 2015) internal citations omitted; 41 U.S.C. § 3307.  FASA is implemented through FAR Part 12 which requires that "contracts for the acquisition of commercial items shall, to the maximum extent practicable, include only those clauses" required by law or "[d]etermined to be consistent with customary commercial practice."  48 C.F.R. § 12.301(a).  FAR Part 12 further precludes the inclusion of "any additional terms or conditions in a solicitation or contract for commercial items in a manner that is inconsistent with customary commercial practice for the item being acquired unless a waiver is approved in accordance with agency procedures."  48 C.F.R. § 12.302(c).

Relying on FASA, ASC argues that when OSHA developed this solicitation for the procurement of commercial items, it was required to include only those terms in solicitations that

---

[11] OSHA prepared an Independent Government Cost Estimate ("IGCE") to assess an appropriate price cap based on the average online course prices of existing OSHA-authorized organizations. AR Tab 6. These price ceilings, as acknowledged by ASC, set the price ceilings above the current course prices, Pl.'s Mot. JAR 25, allowing awardees to raise their prices up to the ceiling price in future years.  [. . .].  AR Tab 40 at 3736-3737.

were "consistent with standard commercial practice."   41 U.S.C. § 3307(e)(2)(B)(ii); 8 C.F.R. § 12.302; Pl.'s Mot. JAR at 27.

The Government argues that FASA does not apply to the Solicitation because FASA is only implemented through the FAR and the FAR does not apply to the Solicitation.  Def. Cross Mot. JAR at 30.  The Court agrees with the Government.

As ASC seems to have cherry picked sections of the relevant portions of the FASA statute regarding implementation, the Court has provided the full portion of section 3307(e). 41 U.S.C. § 3307(e), reads in full:

> (e) Regulations-
>
>> (1)  In general.--The Federal Acquisition Regulation shall provide regulations to implement this section, sections 102, 103, 105, and 110 of this title, and chapter 140 of title 10.
>>
>> (2) Contract clauses.—
>>
>>> (A)  Definition.--In this paragraph, the term "subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of a contractor or subcontractor.
>>>
>>> (B) List of clauses to be included.--The regulations prescribed under paragraph (1) shall contain a list of contract clauses to be included in contracts for the acquisition of commercial end items. To the maximum extent practicable, the list shall include only those contract clauses that are—
>>>
>>>> (i)     required to implement provisions of law or executive orders applicable to acquisitions of commercial items or commercial components; or
>>>>
>>>> (ii)  determined to be consistent with standard commercial practice.

41 U.S.C. § 3307(e).

The statute is clear:  the Federal statutory preference for commercial items does not apply because the statute, in section 3307(e)(1), specifically states it applies only through the FAR. The current Solicitation specifically states that the FAR does not apply.  AR Tab 16 at 67. Therefore, ASC's argument that the Solicitation must comply with 3307(e)(2)(B)(ii) is without merit.

Furthermore, the FAR only applies to the acquisition of supplies or services using *appropriated* funds.  *See* 48 C.F.R. § 1.104 (emphasis added) ("The FAR applies to all

acquisitions as defined in part 2 of the FAR, except where expressly excluded."). 48 C.F.R. §
2.101 defines acquisition. Acquisition means the acquiring by contract with *appropriated* funds
of supplies or services. *Id*. (emphasis added). In the instant case, OSHA does not directly
provide outreach courses to workers and the price for courses is directly paid to the provider.
The Solicitation repeatedly states that the "authorization"-type contracts to be awarded by OSHA
"do not involve payment or compensation by the Government." *See* AR Tab 16 at 101; *see also*
AR Tab 16 at 97 ("contracts resulting from this Solicitation will not be funded with appropriated
funds"); AR Tab 16 at 129 ("These contracts will not involve any compensation or
reimbursement to the Contractor from the government."); AR Tab 16 at 143 ("this Solicitation
does not provide for payment by the Government to the Contractor").

It is clear that the Solicitation does not use appropriated funds, therefore the FAR's
commercial items provision does not apply to this procurement. Therefore, the Court need not
address ASC's arguments as to whether the Solicitation included terms inconsistent with
customary commercial practice but instead the Court reviews the terms under CICA and whether
the terms serve a legitimate agency need.

ASC raises five terms that are inconsistent. Of the five only two claims remain for
review.[12] The first Solicitation term that ASC objects to, requires disclaimer language for third
party websites that refer students to the OSHA-approved training courses with language
identifying the OSHA-authorized training provider. AR Tab 16 at 104. This requirement,
according to the Government, however is already in practice by ASC as they provide a
disclaimer on websites that are not OSHA-authorized or OSHA-approved. Def. Reply at 19.
The second Solicitation term that ASC objects to is the requirement that it must file monthly
reports. AR Tab 16 at 110. ASC contends that it should only be required to provide course
progress reports information to individual students, nothing more. Pl.'s Mot. JAR at 28.

Neither of these terms limits full and open competition. OSHA has determined its needs
and the Court will not second guess it with regard to these terms in the Solicitation.

### C.  The Terms Are Not Ambiguous

In its reply, ASC has withdrawn all but two of its contentions that the Solicitation is
ambiguous. ASC Reply at 28 n.28. The remaining contentions refer to evaluation scheme
regarding cost and pricing data and the evaluation scheme regarding course price. ASC Reply at
28. With regard to the first contention, ASC asserts that it is unclear when OSHA will evaluate
cost. *Id*. However, the Solicitation is clear, it states that cost "will only be a factor if two or
more proposals are otherwise equivalent in Technical Merit and Past Performance." AR Tab 16
at 141, 143.

Its second contention is that the Solicitation does not make clear whether price will be
evaluated in section M.3.E "Administrative Capabilities." ASC Reply at 28. However, in this
section OSHA enunciates that it will be evaluating an offeror's administrative capability to

---

[12] The other terms relate to the IP clauses, cost information, and resellers which the Court
has addressed previously.

collect tuition and fees, not the underlying price. AR, Tab 16, at 139; *see also* AR Tab 32 at 324; AR Tab 36 at 345.  Therefore, price is not relevant to this section.

The Court finds these terms not to be ambiguous.

### D.  OSHA Is Required to Conduct an Organizational Conflict of Interest ("OCIs")

ASC puts forth the argument that a conflict of interest potentially exists involving ClickSafety.com and its unequal access to competitively useful information.  Pl.'s Mot. JAR at 34.  In support of its OCI challenge, ASC relies upon 48 C.F.R. § 9.502(b) which states:  "The applicability of this subpart is not limited to any particular kind of acquisition." *Id*.  ASC asserts that FAR Part 9.5 applies because it uses the term "contracts" and this widens the applicability of the OCI provisions beyond the FAR.  Pl.'s JAR Reply at 24-25.  However, the FAR applies to contracts for *acquisition* – nothing in FAR Part 9.5 or the FAR's definition of "contract" expands OCI coverage beyond the entirety of the FAR. *See* 48 C.F.R. § 1.104; *id.* § 2.101.

As pointed out previously, the FAR does not apply to this Solicitation. The Court will therefore entertain ASC's alternative argument that CICA's requirement for "full and open competition" mandates that OSHA consider potential significant OCIs.  *See* 41 U.S.C. § 3301(a).  Under CICA, full and open competition is only had where "all responsible sources are permitted to submit . . . competitive proposals on the procurement." 41 U.S.C. § 107.  The Court agrees with ASC that under CICA, OSHA is required to perform an OCI evaluation. [13]

ASC contends that the OutreachTrainers Website, operated by ClickSafety, http://www.OutreachTrainers.org, provides ClickSafety with "substantial non-public information."  Pl.'s Mot. JAR at 34.  In particular, ASC argues that as the primary directory for all Online Training Program courses and trainers for the past seven years, it possesses unequal access to non-public information. *Id*.  Through this role, ASC asserts that ClickSaftey has access to information that provides it with a significant competitive advantage in preparing its proposal to the Solicitation that no other offeror possess.

On the other hand, ClickSafety contends that the information regarding actual demand for online training and the breakdown of actual course enrollment was made public by OSHA and was equally available to all prospective offerors, including ASC.  Def.-Int. Reply Mot. at 2.  ClickSafety argues that ASC is only speculating that ClickSaftey is privy to more information. *Id*.  ClickSafety describes the OutreachTrainers Website as a website that only allows visitors to the site to perform a geographic search for classes within a designated mile radius of a given zip code.  *See* Def.-Int. Resp. and Reply Declaration of Brian Tonry at ¶¶ 10-11. There is no ability for visitors to the site to search specifically for online courses and therefore it does not have any access to data that would give it insight into students' interest in or demand for online courses. *See id.* at ¶¶ 11, 12. Thus, argues ClickSafety, the data that can be retrieved is entirely irrelevant to the online Outreach Training Program.

---

[13] The Government concedes that it did not consider OCIs because OSHA "did not believe it was required to conduct such analysis."  Def. Cross JAR at 42.

It is not the Court's job to determine whether or not an OCI exists.  However, the fact that ClickSafety maintains the Website for OSHA and is a potential awardee gives the Court pause.  With the facts as presented above, and under the CICA standard of full and open competition, the Court finds that OSHA's failure to consider a potential OCI or include a solicitation clause addressing an OCI is arbitrary and capricious. The fact that ClickSafety may have information privy only to it is a concern to the Court and one that must be vetted.

Both the Government and ASC agree that the OCI consideration should be done in the first instance at the Agency level.  Therefore, the Court will refer the matter back to OSHA for the OCI determination.  And although FAR Subpart 9.5 is not binding on the Agency in the instant procurement, OSHA should use FAR Subpart 9.5 as a model for its evaluation as the FAR represents the most comprehensive expression of the "basic procurement fairness principles." *See Huntsville Times Co. Inc. v. United States*, 98 Fed. Cl. 100, 106 n.6 (2011) (consulting the FAR in a non-FAR procurement "[t]o the extent that basic procurement fairness principles are elucidated" therein); *see also SUFI Network Servs., Inc. v. United States*, 105 Fed. Cl. 184, 195 (2012) ("[T]he FAR is highly relevant as a guide in the absence of other guidance.").   Using the FAR to conduct its OCI analysis is consistent with its practice as OSHA seems to have no compunction regarding using FAR provisions when it is not compelled to do so: "the solicitation document utilizes a FAR-type format for convenience, and incorporates provisions and clauses adapted from those found in the FAR."   AR Tab 16 at 97.

### E.   Injunctive Relief Is Granted

The next step is for the Court to determine whether injunctive relief is warranted. The Court has determined that OSHA's actions regarding certain portions of the Solicitation were arbitrary, capricious, an abuse of discretion, or otherwise in violation of law. Therefore, ASC has succeeded on the merits.  Next, the Court must weigh the plaintiff's irreparable harm if the court withholds relief, the balance of hardships to the respective parties, and the public interest in granting injunctive relief.  *Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009).

ASC has demonstrated irreparable harm.  Specifically, ASC will suffer irreparable harm by suffering a loss of goodwill within the online training industry and the public that relies on that online training. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004); *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 552 (4th Cir. 1994) (holding that "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.").  Additionally, even if ASC was to be awarded a contract under the current terms, ASC would still be irreparably harmed due to the unduly restrictive IP clauses and lack of OCI evaluation.  Moreover, OSHA will not be harmed by the issuance of injunctive relief.  Although the Court is sensitive to OSHA's interest to move forward and make the awards, operating under the *status quo* will not cause disruption of delivery of training courses.  And finally, the public interest will be served by an injunction by preserving the integrity of the procurement process. *See Cent. Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1343 (Fed. Cir. 1995); *Elec. On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 169

(2012) ("[T]he public interest is served by maintaining the integrity of the procurement system and making sure that procurements are conducted fairly and to maximize competition.").

## VII.   Conclusion

For the reasons set forth above, the Court hereby **GRANTS IN PART** ASC's Motion for Judgment on the Administrative Record.  The Court finds that OSHA's inclusion of paragraph two of IP clause H and the wholesale incorporation of various FAR provisions in IP clause I are unduly restrictive in violation of CICA and is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  The Court further finds that the pre-existing relationship between ClickSafety and OSHA regarding the OutreachTrainers website is a potential OCI that is inconsistent with the CICA standard of full and open competition. Thus, the Court **GRANTS** Plaintiff's request for a permanent injunction regarding the Solicitation in its present form.  If OSHA wishes to make an award under this Solicitation, it is ordered to correct and reissue an amended Solicitation such that it complies with CICA as indicated by the Court and, in addition, it is ordered to conduct an OCI analysis modeled after the appropriate FAR provisions before any award is made under such an amended Solicitation.

The Court **DENIES** ASC's remaining claims.  The Court **GRANTS IN PART** Defendant's Cross Motion for Judgment on the Administrative Record with respect to all claims other than the IP clauses and its failure to perform. The Court further **DENIES** Defendant-Intervenor's Motion for Judgment on the Administrative Record.

ASC's Motion to Supplement the Record and Motion to File a Sur-Reply are **DENIED**.

In the event Plaintiff files a bid protest involving a new or amended solicitation that is related to the Solicitation which is the subject of this opinion the Clerk is directed to assign the protest to the undersigned.

The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge